# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| REBECCA M. BROWN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 6:14-cv-03497-NKL |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff Rebecca M. Brown appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits and supplemental security income. The decision is affirmed.

**I. Background**

Brown was born in 1979. She alleges she became disabled beginning January 28, 2011. The Administrative Law Judge held a hearing on January 15, 2013 and denied Brown's application on May 3, 2013. The Appeals Council denied Brown's request for review. The relevant alleged disability period for purposes of the present appeal is therefore January 28, 2011 through May 3, 2013.

**A. Medical history and opinion evidence**

On November 5, 2010, Brown reported left foot pain and swelling of four days' duration to Michael Beard, M.D., and noted that she had completed the Race for the Cure three weeks earlier. Physical examination showed mild swelling, moderate tenderness, and painful range of motion. One month later, she continued to have tenderness, but the left foot pain was "better." [Tr. 306.]

On January 24, 2011, Brown complained to Dr. Beard of increased anxiety over the previous three months with symptoms of anger, paranoia, insomnia, anxiety, racing thoughts, hallucinations, and suicidal thoughts with a plan. Dr. Beard reported Brown was in moderate emotional distress with decreased affect. Three days later Brown stated that she had stopped taking the prescribed medication because it made her "feel hung over," but she was feeling "better with less suicidal ideation." [Tr. 302.]

Brown was hospitalized from February 2 to February 4, 2011, due to suicidal ideation and severe depression with reports of auditory hallucinations, and was diagnosed with bipolar disorder. During hospitalization, Brown's medication was changed; her mood began to improve; and she reported a decrease in suicidal thoughts.

Brown began treatment at Greenfield Medical Center on June 20, 2011, and reported that she had been off of her bipolar medication for three-to-four months and was experiencing mood swings. The examiner restarted her medication. Two weeks later, Michael Bennett, M.D., at Greenfield, noted that Brown was doing well with the use of medication. Brown had no anxiety later in July 2011.

Frances Anderson, Psy.D., performed a consultative psychological evaluation of Brown on July 1, 2011. [Tr. 355-58.] Dr. Anderson observed that Brown appeared anxious and frightened and her affect was somewhat restricted. Brown denied suicidal ideation and had adequate memory. Dr. Anderson noted Brown's reports of constant pain in her lower back, numbness in her hands and toes, and migraine headaches three-to-four times per month. Dr. Anderson concluded that Brown could understand and remember simple instructions, and had the ability to sustain concentration, pace, and persistence for simple tasks. She had adequate social abilities but would do better with limited public contact and limited social interaction.

2

Case 6:14-cv-03497-NKL   Document 18   Filed 08/26/15   Page 2 of 14

Dr. Anderson diagnosed bipolar disorder not otherwise specified, "reportedly with psychotic features." [Tr. 358.] The ALJ gave the opinion significant weight.

On July 7, 2011, Kenneth Burstin, Ph.D., a state agency consultant, reviewed Brown's records and opined that Brown's bipolar disorder resulted in mild restrictions of activities of daily living; mild difficulties in social functioning; and mild limitations in maintaining concentration, persistence, or pace. [Tr. 339-48.] Dr. Burstin also opined that Brown retained the ability to perform simple, repetitive tasks with simple instructions. The psychologist stated that Brown could adapt to changes in work settings that did not required frequent public contact or very close interaction with others in the workplace. Dr. Burstin checked boxes indicating Brown would have marked limitations with regard to detailed instructions and tasks, and moderate limitations with regard to social functioning. At the time prepared, the ALJ would give the opinion great weight. But the passage of time and provision of subsequent evidence caused the ALJ to give it less weight.

On July 11, 2011, Brown saw Dr. Bennett for a migraine and was given an injection. In August 2011, Brown reported having had low back pain for years, recently worse with "rainy weather." [Tr. 378.] Dr. Bennett noted increased moodiness and increased lower back pain. A lumbar spine x-ray taken August 10, 2011, showed minimal narrowing at the L5-S1 disc space, but was otherwise unremarkable. The doctor tried Brown on naproxen and Feldene for back pain, and in September ordered an MRI. The MRI showed minimal degenerative spondylosis of the lumbar spine and an annular tear at L5-S1. Brown continued to report mood changes with anger and increased lower back pain, through November 2011.

On December 13, 2011, Brown reported that medication was helping her bipolar disorder and her anger was decreased; she did not report any back pain. Her mood continued to be stable through April 2012. The record of a visit with Dr. Bennett on April 4, 2012, reflects,

3

under "Chief Complaint": "[back] pain stable, meds help[;] saw neurosurg[eon]—[no] recommendation." [Tr. 410.] In April 2012, Dr. Bennett ordered physical therapy. Brown reported increased mood swings and stress due to family issues in late April and early May 2012. [Tr. 412-21, 423-25.] Brown continued to report back pain, but the physical examination findings were illegible, or showed minimal objective findings. The treatment records do not reflect that Dr. Bennett ever instructed Brown to refrain from any physical activities.

On June 14, 2012, Dr. Bennett completed a medical source statement with regard to Brown's physical impairments. [Tr. 364-65.] Dr. Bennett checked boxes indicating that Brown could lift or carry twenty pounds occasionally and less than ten pounds frequently; stand or walk less than four hours and sit less than four hours in an eight-hour workday; and would need to alternate sitting and standing. Brown could occasionally climb and balance, but never stoop, kneel, crouch, or crawl. She should avoid exposure to extreme temperatures, noise, vibration, and hazards. The ALJ gave the opinion little weight.

Dr. Bennett also completed a medical source statement with regard to Brown's mental impairment. [Tr. 367-68.] The doctor checked boxes indicating that Brown had marked limitations with regard to making judgments on simple work-related decisions, responding appropriately to changes, and in persistence and pace. He also indicated that Brown had moderate limitations with regard to interacting with co-workers and supervisors and marked limitations in the ability to interact with the public. The ALJ gave the opinion little weight.

### B. Hearing testimony and Brown's self-report

Brown testified that she lives with her husband, three children aged sixteen, thirteen, and ten, and her brother-in-law. She worked as a certified nurse assistant for six years, and stopped in January 2011, due to hospitalization for a "[m]ental breakdown." [Tr. 47-48.] Before that, she worked as a cashier. Brown received all of her treatment for physical and psychological

problems from Dr. Bennett. She stated that she did not seek specialized psychological counseling because she could not afford to drive to the treatment location, and that Dr. Bennett has not "[said] anything" about exploring treatment sources. [Tr. 52.] She testified that her medications cause some sleepiness, and some shakiness of her hands.

Brown filled out a function report in March 2011. She reported she prepares breakfast and helps her children get ready for school; cleans house, prepares lunch, and watches television. Friends and family visit at times. She prepares a snack for her children when they get home from school, and prepares the evening meal and washes the dishes. She does the family's laundry, and some gardening and yard work. She has a driver license and drives short distances, but has a fear of driving alone. She shops for groceries and household items once a month or as needed. She listed playing games on the computer and gardening as hobbies. She attributed her limitations to anxiety, panic attacks, and hearing voices. [Tr. 241-48.]

Brown filled out a report of "Pain and Other Symptoms" in March 2011. [Tr. 239-40.] Where asked to "[d]escribe [her] pain and other symptoms," Brown wrote, "I have tension build up in neck + shoulders from <u>anxiety</u> and <u>stress</u>." [Tr. 239, emphasis in original.] She described the pain as "continuous," and where asked what activities or circumstances cause the pain or other symptoms, she wrote, "Loud noise + alot of fast pace movements around me causes anxiety + stress[,] in which cause the tension + pain." [*Id.*] She reported that she took Aleve for pain and also "[has] to go to a chiropractor" to help with the pain, "But [she hadn't] in a while due to fear of anxiety attack +/or mood changes." [Tr. 240.]

Brown also filled out two medication lists. [Tr. 290, 295.] One is dated 3/20/2012, and the other is undated. But she noted on both lists that in 2011, she began taking naproxen daily, to help with joint pain and swelling, and hydrocodone, "5-325 mg" daily, for back pain. [*Id.*]

Cathy Hodgson, Ed.D., testified as a vocational expert at the hearing. The ALJ posed a

5

hypothetical question to the VE, which assumed an individual of Brown's age, education, and work experience. Using the mental evaluation form Dr. Burstin filled out, Brown's counsel attempted to question the VE using a term the doctor checked off, "moderate restrictions." [Tr. 58-59.] The term was not defined on the form. The ALJ instructed that counsel needed to use functional limitations, not an undefined medical term on a medical form, or the Appeals Council would send back the decision, regardless of the result. [Tr. 59.] Counsel stated that the doctor who filled out the form did not have that information, so counsel did not feel he could state his question in terms of a functional limitation. [*Id.*] The ALJ instructed that the VE would not answer the question. [*Id.*]

### C. The decision

The ALJ found Brown had severe impairments of degenerative joint disease of the lumbar spine with annular tear at L5-S1; degenerative joint disease of the left first metatarsophalangeal joint; morbid obesity; bipolar disorder, not otherwise specified, with psychotic features; and anxiety disorder. [Tr. 25.] The ALJ concluded Brown's impairments do not meet any Listings under the Social Security criteria, and Brown does not claim to meet any.

The ALJ found Brown retained the RFC to

> [P]erform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally bend, twist and turn; never crawl or kneel; occasionally stoop and squat; never climb ladders, ropes or scaffolds, and occasionally ascend and descend stairs. She must avoid all exposure to air or vibrating tools. She can never operate motor vehicles or work around unprotected heights. She can have no contact with the public. She can have no more than occasional contact with coworkers and supervisors. She is unable to respond to changes in the work setting in which complex instructions are involved.

[Tr. 28.] The ALJ concluded Brown's subjective complaints were exaggerated and inconsistent with the other evidence, including clinical and objective findings of record. [Tr. 31.]

**II. Discussion**

Brown argues that the decision must be set aside because the ALJ failed to give adequate weight to the opinion of Brown's treating physician, Dr. Bennett, and because the ALJ did not permit Brown's counsel to ask the vocational expert certain questions.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

**A. Weight given Dr. Bennett's opinions**

The ALJ is charged with the responsibility of resolving conflicts among medical opinions, including conflicts among the various treating and examining physicians. *Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008)); *Estes v. Barnhart*, 275 F. 3d 722, 725 (8th Cir. 2002). An "ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians," *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (internal quotation and citation omitted), nor is an ALJ required to give the most weight to the opinion of a treating medical source. The amount of weight given a treating medical source opinion depends upon support for the opinion found in the record; its consistency with the record; and whether it rests upon conclusory statements. An ALJ must give controlling weight to a treating medical source opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence. *Papesh v. Colvin,* 786 F.3d 1126, 1132 (8th Cir. 2015) (*quoting Wagner v. Astrue,* 499 F.3d 842,

7

848-49 (8th Cir. 2007)). Under S.S.R. 96-2p, "Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," the term "'not inconsistent'…indicate[s] that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (*i.e*., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." 1996 WL 374188 (July 2, 1996),

"Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh,* 786 F.3d at 1132 (*citing Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007)). The opinion may have "limited weight if it provides conclusory statements only, or is inconsistent with the record." *Id*. (citations omitted). But the ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (*quoting Miller v. Colvin*, 784 F. 3d 472, 477 (8th Cir. 2015)). *See also Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (treating physician's opinion appropriately afforded less weight when inconsistent with clinical treatment notes).

While recognizing that Dr. Bennett was Brown's treating physician, the ALJ gave the doctor's opinions little weight because they were not consistent with the type and frequency of treatment the doctor provided, and he was not a mental health specialist, unlike Drs. Anderson and Burstin. These are proper reasons for giving the opinion of a treating physician less weight. *See Brown v. Astrue*, 611 F.3d 941, 953 (8th Cir. 2010) ("Greater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist."); and *Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) ("It is permissible for an

ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

With regard to Dr. Bennett's opinions related to Brown's physical limitations, the doctor merely checked boxes indicating limitations including standing or walking less than four hours and sitting less than four hours in an eight-hour workday. Such a conclusory opinion is not entitled to great weight, even when from a treating physician. *See Anderson v. Astrue,* 696 F.3d 790, 793-94 (8th Cir. 2012) ("[W]e have recognized that a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'") (*quoting Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010).] Dr. Bennett did not recommend more frequent or aggressive treatment, and his records contained minimal objective findings. [Tr. 33, 380-97, 416-21, 423-28, 431, 433.] This lack of clinical findings to support the opinion is further basis to give it little weight. *See Teague v. Astrue,* 638 F.3d 611, 615 (8th Cir. 2011) ("Given that the 'check-off form' did not cite any clinical test results or findings and Dr. Lowder's previous treatment notes did not report any significant limitations due to back pain, the ALJ found that the MSS was entitled to 'little evidentiary weight.'").

Dr. Bennett's opinion concerning Brown's physical limitations is also inconsistent with the record as a whole. Brown did not complain of physical limitations due to pain, whether in the function report or the pain report she filled out. To the extent Brown complained of limitations on daily activities in her function report, she attributed those limitations to anxiety, panic attacks, and hearing voices. Nor did she complain of physical limitations due to pain during the hearing. She mentioned only that she took pain medication for problems with the toes and arch of her left foot. [Tr. 53.]

Dr. Bennett's opinion regarding Brown's mental limitations consisted solely of checkboxes without narrative explanation to support them. Furthermore, Dr. Bennett indicated

9

Brown would have marked limitations with regard to making judgments, responding to changes, persistence and pace, and interacting with the general public. But Dr. Bennett's treatment records indicated that Brown's bipolar disorder was predominantly stable on medication, and Brown sometimes failed to take her medication. Brown was briefly hospitalized for a mental health condition in February 2011, but sought no specialized treatment until she first reported to Greenfield Medical Center in June 2011. Within two weeks of starting medication, Brown was doing well, and her mood remained predominantly stable with occasional exacerbations due to situational stressors. These treatment notes, indicating predominantly stable mood with no recommendation for more aggressive or specialized treatment, are not consistent with the limitations provided by Dr. Bennett, and the ALJ properly gave the opinion little weight.

In contrast, the ALJ gave significant weight to the opinion of Dr. Anderson, a psychologist who examined Brown in July 2011. Dr. Anderson opined that Brown could understand and remember simple instructions; had the ability to sustain concentration, pace, and persistence for simple tasks; and had adequate social abilities, but would do better with limited public contact and limited social interaction. The ALJ's RFC finding is consistent with that opinion. Further, these limitations are consistent with the findings on examination, Brown's activities, and the level and frequency of her treatment. Therefore, the ALJ properly gave the opinion of Dr. Anderson significant weight. *See Wildman*, 596 F.3d at 964 ("[A]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence.") (internal citation and quotation omitted).

Finally, the ALJ properly considered the opinion of Dr. Burstin, the state agency psychological consultant, who reviewed Brown's records in July 2011. *See Casey v. Astrue,* 503 F.3d 687, 694 (8th Cir. 2007) ("The ALJ did not err in considering the opinion of [the State

10

agency medical consultant] along with the medical evidence as a whole."); 20 C.F.R. §§ 404.1527(e) and 416.927(e). The ALJ gave this opinion less weight than the opinion of Dr. Anderson because later evidence supported the finding of different limitations than those opined by Dr. Burstin. However, Dr. Burstin's opinion included that Brown was able to perform simple tasks and instructions that did not require frequent public contact or very close interaction with others in the workplace. The ALJ's finding is consistent with this opinion. Overall, the ALJ properly considered the medical opinions of record and articulated proper bases for the weight given to each opinion and to the evidence as a whole.

Brown argues that if the ALJ gave greater weight to Dr. Bennett's opinion, then her subjective allegations would be found credible. Instead, the record shows that the ALJ properly considered the credibility of Brown's subjective allegations, and found these allegations were not entirely credible. Citing *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984), and 20 C.F.R. §§ 404.1529 and 416.929, the ALJ articulated the inconsistencies on which he relied, including inconsistencies between the objective medical evidence and Brown's subjective allegations; Brown's noncompliance with treatment recommendations and medications; the lack of specialized treatment for her allegedly disabling impairments; and her activities of daily living. Credibility questions concerning a claimant's subjective testimony are "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (*quoting Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001)). The ALJ gave good reasons for discrediting Brown's credibility, and the credibility determination is supported by substantial evidence on the whole record. Therefore, the credibility determination does not suffice as a basis for setting aside the ALJ's decision with respect to Dr. Bennett's opinion. *See Halverson*, 600 F.3d at 931-33 ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so,

we will normally defer to the ALJ's credibility determination.") (internal quotation and citation omitted).

Brown argues that the rejection of Dr. Bennett's opinion of physical limitations means no expert opinion supports the RFC. [Doc. 14, p. 21.] But that is not a reason to set aside the RFC. An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of his limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005). Here, the RFC determination was based on substantial evidence, including medical evidence, on the record as a whole. The ALJ properly limited the RFC determination "to only the impairments and limitations he found to be credible based on his evaluation of the entire record." *See McGeorge v. Barnhart*, 321 F.3d 766, 769 (8th Cir. 2003). Brown simply failed to bear her burden of persuasion to prove disability and demonstrate a more limited RFC.

The ALJ's decision to give Dr. Bennett's opinion little weight will not be disturbed.

### B. Questioning of the vocational expert

When posed with a hypothetical question that included all of Brown's credible impairments, the VE testified such an individual could perform the positions of final assembler, table worker, and administrative support worker. The ALJ properly relied on the vocational

expert testimony in formulating the RFC. *See McGeorge v. Barnhart*, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluation of the entire record."). But Brown complains that her counsel was not allowed to fully question the VE concerning Brown's mental limitations, and that had counsel been able to do so, the VE may have agreed Brown was precluded from all work. The ALJ's limitation of the questioning is no basis for reversal.

The ALJ explained at the hearing that Brown's counsel could not ask the VE about "moderate" limitations, an undefined medical term from a medical form filled out by Dr. Bennett, but that if Brown's counsel put the limitations in terms of functional ones, the VE would be permitted to answer. Brown's counsel would not do so, saying he was not sure that the doctor himself had so understood the terms.

The SSA form 4734-SUP that Dr. Burstin completed contains limitations, e.g., "moderate," "marked," and "mild," that are specifically addressed in the SSA Programs Operations Manual System (POMS). The POMS states that limitations in section "I" of that form "do[] not constitute the RFC assessment" but rather indicate that the extent of the capacity or limitation must be described in narrative format in the third section of the form. *See* POMS DI 24510.060, "Mental Residual Functional Capacity Assessment" available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060 (visited June 20, 2015). According to the POMS, the RFC finding is in the third section of the form (marked as "III"). *See id.* The SSA has also made clear that "moderate," "marked," and "mild" findings in the evaluation of a mental impairment are not to be used as functional limitations in an RFC finding. *See* Social Security Ruling 96-8p, 1996 WL 374184 at *4 (S.S.A. 1996). Similarly, the Eighth Circuit Court of Appeals has indicated that a hypothetical question must include limitations not in

13

diagnostic terms, but in terms capturing the "concrete consequences" of those impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (citation omitted).

Even had the VE been permitted to answer the question posed by Brown's counsel, the outcome would not have changed. *See Welsh v. Colvin,* 765 F.3d 926, 929 (8th Cir. 2014) (holding that ALJ's failure to explicitly consider an applicable Social Security Ruling "had no practical effect on the decision and therefore [was] not a sufficient reason to set aside the ALJ's decision"). Notwithstanding that Brown does not know how Dr. Bennett himself defined "moderate," Brown argues that if "moderate" had been defined in the least limiting way, i.e., as "occasional," or less than one third of the work day, then the VE would have been asked about a hypothetical individual who could have only occasional interaction with co-workers and supervisors. And, Brown continues, the VE may have testified that such limitation precluded all work. [Doc. 14, p. 26.] In fact, the VE was presented with exactly that hypothetical by the ALJ. The ALJ's hypothetical question included "no contact with the public is permitted; contact with coworkers and supervisors can be no more than occasional." [Tr. 56.] In response to that hypothetical question, and even including additional limitations, the vocational expert identified multiple jobs that such an individual could perform. Accordingly, the ALJ's limitation on questioning of the VE did not have any practical effect on the outcome.

The ALJ's decision to limit questioning of the vocational expert will not be disturbed.

### III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: August 26, 2015  
Jefferson City, Missouri